1   ISMAIL J. RAMSEY (CABN 189820)
    United States Attorney
2
    MARTHA BOERSCH (CABN 126569)
3   Chief, Criminal Division

4   NICHOLAS J. WALSH (CABN 314290)
    Assistant United States Attorney
5
         450 Golden Gate Avenue, Box 36055
6        San Francisco, California 94102-3495
         Telephone: (415) 436-7248
7        FAX: (415) 436-7234
         Email: nicholas.walsh@usdoj.gov
8
9   Attorneys for United States of America

10              UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12               SAN FRANCISCO DIVISION

13   UNITED STATES OF AMERICA,          )   Case No. 22-CR-00278 CRB
                                        )
14          Plaintiff,                  )   UNITED STATES' SENTENCING
                                        )   MEMORANDUM
15      v.                              )
                                        )
16   FARES ABDO AL EYANI and            )   Hearing Date: March 29, 2024
     SABA MOHSEN DHAIFALLAH,            )   Time: 9:30 a.m.
17                                      )
            Defendant.                  )
18                                      )
     _____)

19

20

21

22

23

24

25

26

27

28

### TABLE OF CONTENTS

INTRODUCTION ......................................................................................................................1

PROCEDURAL BACKGROUND.............................................................................................1

FACTUAL BACKGROUND .....................................................................................................2

    I.     Overview of the Investigation................................................................................2

    II.    Mr. Al Eyani Purchased Ten Night Vision Rifle Scopes from a Gun Store in San Bruno....................................................................................................................3

    III.   Ms. Dhaifallah Made Other Online Purchases of Night Vision Devices ............4

    IV.   In November 2019, the Investigation Found Firearms in a Shipping Container in Mr. Al Eyani's Name Destined for the Sultanate of Oman at the Port of Oakland ...................................................................................................................6

    V.    Investigation of Receiver of the Shipping Containers Uncovered Three Container Shipments Destined for the Sultanate of Oman at the Port of Long Beach, California ....................................................................................................7

    VI.   In December 2019, the Investigation Discovered Night Vision Devices in Two Container Shipments Destined for the Sultanate of Oman at the Port of Oakland ...................................................................................................................7

    VII.  Forensic Examination of the Seized Items Connects Mr. Al Eyani by Fingerprint and DNA Comparison to the Night Vision Scopes .........................9

    VIII.  A Search of Mr. Al Eyani and Ms. Dhaifallah's Home Further Links Mr. Al Eyani to the Firearms ..........................................................................................10

    IX.   After Her Arrest, Ms. Dhaifallah Made Inculpatory and False Statements to the FBI ................................................................................................................11

ARGUMENT .............................................................................................................................12

    I.     The Sentencing Guidelines Calculations and Proposed Sentences...................12

         A.    Mr. Al Eyani's Calculation ...................................................................12

         B.    Ms. Dhaifallah's Calculation ................................................................13

    II.    The Proposed Sentences are Just and Meet .......................................................13

         A.    Mr. Al Eyani was the Primary Actor in this Criminal Endeavor and Therefore Deserves a Significant Sentence ..........................................14

         B.    Because Ms. Dhaifallah's Involvement in this Criminal Enterprise was Limited and Her Conviction Concerns Her Lying to the FBI, Probation is an Appropriate Sentence ...................................................................16

CONCLUSION...........................................................................................................................17

**INTRODUCTION**

The United States respectfully submits this sentencing memorandum regarding both defendants in this matter, Fares Abdo Al Eyani and Saba Mohsen Dhaifallah.  As explained below, the United States has constructed a joint resolution to this matter that pairs each defendant's conduct with an appropriate sentence.

Mr. Al Eyani, after pleading guilty pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, is before the Court for sentencing on one count of Conspiracy to Unlawfully Export Defense Articles in Violation of the Arms Export Control Act ("AECA"), 22 U.S.C. § 2778 *et seq.*, and its implementing regulations, the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. §§ 120–130, in violation of 18 U.S.C. § 371, and seven counts of Attempted Unlawful Export of Defense Articles in Violation of the AECA and the ITAR, in violation of 22 U.S.C. §§ 2778(b)(2) and 2778(c); 22 C.F.R. §§ 120–130; and 18 U.S.C. § 2.  For the reasons set forth below, the United States requests that the Court impose the following sentence on Mr. Al Eyani: (1) 48 months incarceration; (2) three years of supervised release, with special conditions as set out by the United States Probation Office in the Presentence Investigation Report ("PSR"); and (3) a special assessment of $800.00.

Ms. Dhaifallah, after pleading guilty pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, is before the Court for sentencing for Making a False Statement to a Governmental Agency in violation of 18 U.S.C. § 1001.  For the reasons set forth below, the United States joins the Probation Office and Ms. Dhaifallah in requesting that the Court accept her plea and impose the following sentence: (1) three years of probation, with special conditions as set out by the Probation Office in the PSR; and (2) a special assessment of $100.00.

The United States further requests that the Court order forfeiture of the property outlined in each of the plea agreements in this matter.

**PROCEDURAL BACKGROUND**

On August 5, 2020, a Criminal Compliant issued in the Northern District of California charging Fares Abdo Al Eyani and Saba Mohsen Dhaifallah with a single count of Attempted Unlawful Export of Defense Articles in Violation of the AECA and the ITAR and Aiding and Abetting, in violation of 22

U.S.C. §§ 2778(b)(2) and 2778(c); 22 C.F.R. §§ 120–130; and 18 U.S.C. § 2.  Dkt. 1.

On August 25, 2020, Mr. Al Eyani and Ms. Dhaifallah were arrested by the Federal Bureau of Investigation ("FBI").  The next day, August 26, 2020, each defendant was arraigned and released on a $100,000 unsecured bond with conditions of release.  Dkts. 4-9. A long period of discovery production and discovery review commenced.

On July 27, 2022, the Grand Jury for the Northern District of California indicted Mr. Al Eyani and Ms. Dhaifallah, charging each with one count of Conspiracy to Unlawfully Export Defense Articles in Violation of the AECA, 22 U.S.C. § 2778 *et seq.*, and its implementing regulations, the ITAR, 22 C.F.R. §§ 120–130, in violation of 18 U.S.C. § 371, and seven counts of Attempted Unlawful Export of Defense Articles in Violation of the AECA and the ITAR and Aiding and Abetting, in violation of 22 U.S.C. §§ 2778(b)(2) and 2778(c); 22 C.F.R. §§ 120–130; and 18 U.S.C. § 2. Dkt. 52.

On December 12, 2023, a Superseding Information was filed as to Ms. Dhaifallah, charging her with one count of Making a False Statement to a Governmental Agency in violation of 18 U.S.C. § 1001.  Dkt. 74.  The next day, December 13, 2023, Ms. Dhaifallah waived her right to indictment and was arraigned on the Superseding Information.  Dkts. 76, 80.

Later on December 13, 2023, Mr. Al Eyani pleaded guilty to all eight counts in the Indictment pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, and Ms. Dhaifallah pleaded guilty to the single count in the Superseding Information.  Dkts. 75, 77, 78, 79.

Sentencing for both defendants is set for March 29, 2024, at 9:30 a.m. Dkt. 81.  The United States' Sentencing Memorandum is therefore filed in compliance with Local Rule 32-5(b).

## FACTUAL BACKGROUND

### I.    Overview of the Investigation

This smuggling investigation developed out of a tip from a San Bruno, California gun store about a suspicious bulk purchase of night vison rifle scopes in August 2019.  The Federal Bureau of Investigation ("FBI"), Homeland Security Investigations ("HSI") and United States Customs and Border Protection ("CBP") followed leads to uncover three separate exports of shipping containers from the Port of Oakland and the Port of Long Beach to the Sultanate of Oman in the second half of 2019.  Two

of these shipments were successfully stopped and searched, resulting in the seizure of four firearms and over forty night vision devices, including some of the rifle scopes bought in San Bruno.  These shipments were undertaken by husband Mr. Al Eyani and wife Ms. Dhaifallah.

**II.     Mr. Al Eyani Purchased Ten Night Vision Rifle Scopes from a Gun Store in San Bruno**

This investigation began after a tip from a gun store in San Bruno, California, on August 27, 2019. As interviews later developed, sometime during the week of August 19, 2019, a customer who was only known as "Abdul," purchased a long-range night vision rifle scope for $499.  That day, he made his purchase, went to his car, then returned to the store, and asked how to purchase five more of the scopes.

Then, on August 26, 2019, a woman – later determined to be Ms. Dhaifallah – called the gun store and attempted to order the same night vision rifle scopes over the phone.  The store employee told the woman she would have to appear in person to make her proposed purchase.

The next day, August 27, 2019, Mr. Al Eyani came to the store and asked to purchase ten ATN X-Sight II night vision capable rifles scopes – the same type of night vision rifle scope Abdul purchased the week before and the woman inquired about the day before.  Because the store did not have them in stock, Mr. Al Eyani ordered them to be delivered to the gun store.  He asked for, and was given, the same price as Abdul.  He first attempted to make the $5,451 purchase using a combination of cash and a credit card in the name of his friend.  The store employee declined to allow the use of a credit card in someone else's name.  Mr. Al Eyani then asked where was the closest Wells Fargo Bank branch, and he was given directions to the nearest one.  Mr. Al Eyani departed and returned shortly thereafter, this time with $5,460 in cash.  He made the purchase.  Mr. Al Eyani's identity was confirmed by checking his California Drivers License.  Mr. Al Eyani left his cell phone number to call when the rifle scopes arrived.

On September 9, 2019, a woman – later determined to be Ms. Dhaifallah – called the San Bruno gun store to inquire about whether the ten night vision rifle scopes Mr. Al Eyani had purchased had arrived at the store for pick up.  At that time, an employee stated the rifle scopes were not ready.  Later that day, a store employee called back Mr. Al Eyani directly at his mobile phone number that he gave the store and informed him that the ten night vision rifle scopes were available for pick up.

UNITED STATES' SENTENCING MEMORANDUM
Case No. 22-CR-00278 CRB

3

1      The next day, September 10, 2019, Mr. Al Eyani returned to the San Bruno gun store right as the

2 store opened to pick up his ten rifle scopes. Store staff provided an "Export Compliance Form" printed

3 from ATN Corporation's website, notifying Mr. Al Eyani of the export regulations for the scopes. Mr.

4 Al Eyani signed the form, which stated that he understood that "it is unlawful to export or re-export, or

5 attempt to export or re-export, any of these products, for which a license or written approval from the

6 U.S. Government is required, without first obtaining any license or written approval." Store staff made

7 of copy of the signed form along with his California Drivers License and provided it to Mr. Al Eyani as

8 he completed the pick-up. FBI agents witnessed Mr. Al Eyani place the ten rifle scopes in the trunk and

9 back seat of his registered vehicle directly after exiting the gun store.

10 **III.    Ms. Dhaifallah Made Other Online Purchases of Night Vision Devices**

11      Ms. Dhaifallah's toll records show that her phone called the San Bruno gun store on both August

12 26 and September 9, 2019, the dates on which the unknown woman called asking about night vision

13 scopes and then about the availability of the ten night vision scopes purchased by Mr. Al Eyani.

14      Ms. Dhaifallah's toll records also show that on August 26, 2019, the same day as the initial call

15 to the San Bruno gun store, she also called a gun store in Burlingame, California. A store employee,

16 while not able to specifically recall the precise timing of the call, indicated that during this time period, a

17 woman called seeking as many as 20 night vision rifle scopes. Further, the toll records show that on

18 August 26, 2019, Ms. Dhaifallah also called ATN Corporation, an importer and manufacturer of night

19 vision rifle scopes in South San Francisco, California. ATN is the brand of night vision rifle scopes that

20 Mr. Al Eyani bought.

21      Ms. Dhaifallah's PayPal records indicate that also on August 26, 2019, between 11:45 a.m. and

22 1:00 p.m., Ms. Dhaifallah ordered $6,325.58 worth of ATN X-Sight II night vision rifle scopes from

23 Factory Outlet Stores, and $6,484.18 worth of a slightly different type of ATN X-Sight II night vision

24 rifle scopes directly from ATN Corporation.

25      The next day, August 27, 2019, and the same day Mr. Al Eyani made his in-person purchase of

26 ten night vision rifle scopes at the San Bruno gun store, Ms. Dhaifallah called both the Factory Outlet

27 Store and ATN Corporation, per her mobile phone records.

28      On August 28, 2019, Ms. Dhaifallah's PayPal records indicate that both Factory Outlet Stores

UNITED STATES' SENTENCING MEMORANDUM
Case No. 22-CR-00278 CRB

1  and ATN Corporation refunded the money she paid them on August 26, 2019.  By reasonable inference,

2  it appears that because Mr. Al Eyani was able to obtain ten night vision rifle scopes for $5,451.58 from

3  the San Bruno store, a price lower than the online prices of $6,325.58 and $6,484.18, Ms. Dhaifallah

4  sought a refund for her online purchases.

5      On August 27, 2019, at 9:22 a.m., Ms. Dhaifallah received an email from ATN Corporation

6  confirming the earlier order of ten X-Sight HD scopes through its website and requesting the purchaser

7  complete and return an export compliance form.  The email from ATN Corporation stated, "The form

8  simply states that you are aware the product(s) being purchased are subject to federal prosecution if

9  exported or brought outside of the United States."  The attached export compliance form explained that

10  "Export of night vision equipment and optical sighting equipment (including user manuals) is controlled

11  by the U.S. Department of State Directorate of Defense Trade Controls…" and specifically cited ITAR.

12  It went on to notify the purchaser that "**all** of the products obtained from ATN Corp. are subject to one

13  or more of the export control laws and regulations of the U. S. Government…." (emphasis in original).

14      On September 3, 2019, which is in between when Mr. Al Eyani ordered his rifles scopes and

15  when he picked them up, Ms. Dhaifallah's eBay and PayPal account records indicate that she purchased

16  on eBay 19 "5x40 Infrared Night Vision Monocular 8GB DVR Telescopes for Hunting Surveillance"

17  for $1,983.60.  An email was sent to her Yahoo account at 12:02 a.m. that same day confirming the

18  purchase and showing a shipping address of Mr. Al Eyani and Ms. Dhaifallah's Oakland apartment.

19      On October 13, 2019, Ms. Dhaifallah's eBay and PayPal account records indicate that she

20  purchased ten "NVG Night Vision Goggles IR Infrared Technology" for $1,900.00, plus $175.75 in

21  sales tax.  A PayPal receipt sent to Ms. Dhaifallah's Yahoo email address at 11:36 a.m. provided Ms.

22  Dhaifallah as the purchaser.  An email at 11:37 a.m. confirmed the purchase and the shipping address as

23  Mr. Al Eyani's and Ms. Dhaifallah's Oakland apartment.  The items were shipped, according to another

24  email, the next day by Federal Express.  A fourth email indicated that the ten rifle scopes were delivered

25  to Mr. Al Eyani's and Ms. Dhaifallah's apartment in Oakland at 4:42 p.m. on October 21, 2019.

26      Also on October 13, 2019, Ms. Dhaifallah's eBay and PayPal account records indicate that she

27  purchased seven "Call of Duty Night Vision Goggles w. Collectable Stand" for $1,130.15, plus $104.54

28  in sales tax.  A PayPal receipt sent to Ms. Dhaifallah's Yahoo email address at 11:45 a.m. provided Ms.

1  Dhaifallah as the purchaser.  Another email at the same time from eBay confirmed the purchase and

2  shipping address as Mr. Al Eyani's and Ms. Dhaifallah's Oakland apartment.  The items were shipped,

3  according to another email, the next day by Federal Express.  A fourth email indicated that the seven

4  night vision goggles were delivered to Mr. Al Eyani's and Ms. Dhaifallah's apartment in Oakland at

5  6:25 p.m. on October 17, 2019.

6  **IV.   In November 2019, the Investigation Found Firearms in a Shipping Container in Mr. Al
       Eyani's Name Destined for the Sultanate of Oman at the Port of Oakland**

7
        On November 12, 2019, CBP identified an outbound shipping container at the Port of Oakland

8  connected to Mr. Al Eyani.  In particular, the shipping paperwork provided by the freight forwarder[1]

9  listed Mr. Al Eyani's name and telephone number as the exporter.  The shipping container was

10  scheduled to depart November 15, 2019, destined for the Sultanate of Oman.

11        The departure date for the shipping container was delayed.  On November 18, 2019, CBP

12  searched the shipping container and discovered four disassembled firearms wrapped in aluminum foil

13  and interspersed between car parts packed inside the passenger compartment of one of four vehicles

14  inside the shipping container.  The weapons found were: (1) an AR short barrel rifle, .223 caliber with

15  no serial number or manufacturer, with one magazine; (2) a HS Product/Springfield Armory, model

16  XDE-9, 9mm pistol serial number HE917106, with one magazine; (3) one pink SCCY Industries, model

17  CPX-2, 9mm pistol, serial number 164212; and, (4) a .40 caliber pistol, with Polymer80, Inc. PF940C

18  frame, no serial number.  The serial numbers on the two handguns indicated they were registered in

19  Virginia and Arizona.  Additionally, 39 rounds of ammunition, in two different calibers, were also

20  found.

21        The rifle lower (or 80%) was controlled on the USML under Category I(g) and a State

22  Department license was required for export or temporary import.  The three handguns were controlled

23  on the USML under Category I(a) and a State Department license was required for export or temporary

---

[1] Freight forwarders are entities that organize shipments for individuals or corporations to get goods from one place to another, usually on behalf of a manufacturer seeking to send goods to a market, customer, or final point of distribution.  A forwarder does not move the goods but acts as an expert in the logistics network.  International freight forwarders have additional expertise in preparing and processing customs documentation and performing activities pertaining to international shipments.  As a result of this expertise, many individuals and corporations shipping goods internationally will use a freight forwarder.

import. At least one of the magazines was controlled on the USML under Category I(h) and a State Department license was required for export or temporary import. The ammunition was controlled on the USML under Category III(a) and a State Department license was required for export or temporary import.

On February 7, 2020, the DDTC issued a memorandum indicating a diligent check had been conducted to identify registration and license history that would have allowed either or both Mr. Al Eyani and Ms. Dhaifallah to export controlled items out of the United States. The DDTC search revealed there were no records indicating either Mr. Al Eyani or Ms. Dhaifallah had applied for or received an export license license to export the weapons.

Furthermore, Mr. Al Eyani did not disclose he was exporting firearms. Mr. Al Eyani declared in customs paperwork that the contents of the shipping container were four automobiles, three motorcycles, and $1,000 in "household goods." The value of the rifle discovered likely exceeds $1,000 by itself.

The weapons were removed, and the rest of the shipment was released to travel to the Sultanate of Oman. The shipment eventually arrived at its destination on or about January 14, 2020.

The shipping documents for the shipping container identified the receiver of the shipping container in the Sultanate of Oman and listed a particular phone number contact.

**V.     Investigation of Receiver of the Shipping Containers Uncovered Three Container Shipments Destined for the Sultanate of Oman at the Port of Long Beach, California**

On or about November 14, 2019, CBP identified three outbound shipping containers at the Port of Long Beach connected to the same person as the earlier shipment, also destined for the Sultanate of Oman. One had already shipped on November 12, 2019, and a second had already shipped on November 13, 2019. Neither had been inspected. The third, remaining shipping container was delayed by CBP. On or about November 14, 2019, CBP inspected the third shipping container and did not discover any contraband.

**VI.     In December 2019, the Investigation Discovered Night Vision Devices in Two Container Shipments Destined for the Sultanate of Oman at the Port of Oakland**

On December 16, 2019, FBI surveillance of Mr. Al Eyani observed Mr. Al Eyani at an auto shop in Oakland. Prior surveillance indicated that Mr. Al Eyani worked at that location. At approximately

UNITED STATES' SENTENCING MEMORANDUM
Case No. 22-CR-00278 CRB

1   1:14 p.m., FBI surveillance observed Mr. Al Eyani driving a dark-colored Toyota Prius.  Mr. Al Eyani

2   was then observed removing from the Prius a brown cardboard box with white and purple shipping

3   labels on the top.  Mr. Al Eyani was then observed placing the box inside the trunk of a lime green Kia

4   Soul.  Mr. Al Eyani then drove to a freight forwarder in Oakland.

5          On December 17, 2019, CBP identified two shipping containers associated with Mr. Al Eyani at

6   the Port of Oakland destined for the Sultanate of Oman.  The shipping paperwork for the two containers

7   listed the wife of Mr. Al Eyani's close friend, but also his own name in a parenthetical, as the exporter.

8   The document provided Mr. Al Eyani's telephone number as the exporter telephone contact number.

9   The recipient of the two shipments was listed as a third party but used the same number as the one listed

10  on Mr. Al Eyani's earlier, November 2019, Oakland shipment paperwork.

11         On December 20, 2019, CBP conducted an outbound border search of the two shipping

12  containers identified at the Port of Oakland.  They contained eight vehicles packed with suitcases full of

13  personal effects and household goods.  Within three of the eight vehicles, the search uncovered boxes

14  containing 44 goggles, monoculars, and rifle scopes.  At least 40 of those items were night vision

15  capable.  None of these items were declared on the export forms.  CBP detained all 44 items for export

16  license determinations.

17         Based upon serial number comparison, seven of the 40 night vision capable devices were the

18  same ATN X-Sight II night vision rifle scopes purchased and later picked up by Mr. Al Eyani at the San

19  Bruno gun store on September 10, 2019.  Five of those rifle scopes were in a box in a Porsche Cayenne.

20  Two of the rifle scopes were in the trunk of a lime green Kia Soul in a brown cardboard box with white

21  and purple shipping labels on the top.  That box appeared to be the same brown cardboard box with

22  white and purple shipping labels on the top that FBI surveillance observed Mr. Al Eyani put in the trunk

23  of the same lime green Kia Soul on December 16, 2019.

24         On September 11, 2019, the DDTC provided a first level review to the FBI determining that

25  ATN X-Sight II 3-14x rifle scopes were and are controlled on the USML under Category XII(c)(2)(iii)

26  and a State Department license pursuant to the ITAR is required for export or temporary import.

27         On February 7, 2020, the DDTC issued a memorandum indicating a diligent check had been

28  conducted to identify registration and license history that would have allowed either or both Mr. Al

UNITED STATES' SENTENCING MEMORANDUM
Case No. 22-CR-00278 CRB

8

Eyani and Ms. Dhaifallah to export controlled items out of the United States.  The DDTC search

revealed there were no records indicating either Mr. Al Eyani or Ms. Dhaifallah had applied for or

received an export license that would have allowed them to legally export ATN X-Sight II HD 3-14 rifle

scopes out of the United States.

On May 15, 2020, a second level review of the seven rifle scopes was provided to the FBI by the

Office of Defense Trade Controls Policy ("DTCP").  DTCP determined that ATN X-Sight II 3-14x rifle

scopes were and are a defense article subject to the jurisdiction of the Department of State in accordance

with ITAR.  The remaining 33 night vision capable items found in the December 17, 2019 shipping

containers appear to correspond in part with the items Ms. Dhaifallah purchased on eBay using PayPal

in September and October 2019.  For example, 16 of the items are labeled "5x40 Infrared Night Vision

Monocular 8GB DVR Telescopes for Hunting Surveillance," corresponding with Ms. Dhaifallah's

purchase of 19 of these items on September 3, 2019.  Eleven of the items are "Call of Duty Night Vision

Goggles" and the collectable stands were discovered as well, corresponding with Ms. Dhaifallah's

purchase of seven of these items on October 13, 2019.

HSI submitted remaining 33 night vision capable items for license determinations to the DDTC.

In January 2020, it was determined those 33 night vision capable items were <u>not</u> subject to export

license requirements pursuant to ITAR.

HSI also submitted the seized items to the Department of Commerce, Bureau of Industry

Security ("BIS").  BIS determines if items are subject to export controls other than ITAR.  BIS

determined, of the 33 items, five were night vision rifle scopes that required a license for export to the

Sultanate of Oman and three counterfeit non-night vision rifle scopes also required an export license. It

appears that many of the remaining determinations were not possible because the items were

manufactured in China and therefore confirmation of their exact status was unfeasible.

**VII.    Forensic Examination of the Seized Items Connects Mr. Al Eyani by Fingerprint and DNA
Comparison to the Night Vision Scopes**

On January 29, 2020, the FBI sent the FBI Laboratory the four seized weapons, seven ATN X-

Sight II HD 3-14 night vision rifle scopes, the ammunition, and packaging to be tested for fingerprints,

DNA, and other connections.

UNITED STATES' SENTENCING MEMORANDUM
Case No. 22-CR-00278 CRB

9

On March 26, 2020, the FBI laboratory completed its latent fingerprint analysis.  Ten latent prints suitable for comparison were collected.  Those ten latent prints came from the cardboard box with white and purple shipping labels that was found in the trunk of the lime green Kia Soul during the December 20, 2019 CBP container search.  As noted earlier, FBI surveillance witnessed Mr. Al Eyani place a brown cardboard box with white and purple shipping labels in the trunk of a lime green Kia Soul on December 16, 2019.   Of those ten latent prints, nine were fingerprints and one was a palm impression print.  All nine of the fingerprints collected were identified as Mr. Al Eyani's when they were compared against a prior fingerprint card of Mr. Al Eyani.  There was no palm printer exemplar for Mr. Al Eyani to compare against the palm print recovered, and thus, the palm impression print was deemed inconclusive.

On April 21, 2020, the FBI Laboratory completed its preliminary DNA analysis of the items.  Male DNA samples suitable for comparison purposes were found on the rifle, one handgun, and the strap and edge of the cloth carrying case for one of the night vision rifle scopes found in the brown cardboard box with white and purple shipping labels found inside a shipping container on December 20, 2019.  After Mr. Al Eyani and Ms. Dhaifallah were arrested on August 5, 2020, DNA buccal samples were obtained from both.  A comparison of the samples excluded Ms. Dhaifallah from all collected samples and confirmed Mr. Al Eyani's association with the DNA sample collected from the strap of a cloth case containing one of the rifle scopes found in the brown cardboard box with white and purple shipping labels found inside a shipping container on December 20, 2019.  The lab report suggests the likelihood of someone other than Mr. Al Eyani being the source of the DNA on that strap to be one in 880 septillion, or, as the FBI Laboratory states, there is "Very Strong Support for Inclusion" of Mr. Al Eyani as the source.

## VIII.   A Search of Mr. Al Eyani and Ms. Dhaifallah's Home Further Links Mr. Al Eyani to the Firearms

Mr. Al Eyani and Ms. Dhaifallah were charged by criminal complaint on August 5, 2020. They were arrested on August 25, 2020, and at the time of their arrest, a search warrant was simultaneously executed on their home.  A few noteworthy items were seized, including many digital devices.

Most probative of the non-digital items seized were: (1) Mr. Al Eyani's signed copy of the

1  "Export Compliance Form" printed from ATN Corporation's website, notifying Mr. Al Eyani of the

2  export regulations for the ATN scopes in Count 7; and (2) a notebook that contained a handwritten

3  ledger in Arabic concerning the purchase and sale of firearms.

4  Most probative of the digital items seized was Mr. Al Eyani's phone.  A few highlights from Mr.

5  Al Eyani's phone include: (1) a February 2020 chat with an unknown individual in which Mr. Al Eyani

6  explains where he placed items disassembled, wrapped in tin foil, in a particular Kia, and he sends a

7  photo of the Kia; the Kia is the same car in which the firearms were found, wrapped in tin foil, in the

8  November 2019 shipping container search; that container arrived in Oman in January 2020, and access

9  was not granted to the shipping container until February 2020; and (2) numerous discussions that appear

10  to be about the purchase and sale of firearms, including, at times, photographs of firearms, including at

11  least one of a .50 caliber machinegun.

12  **IX.    After Her Arrest, Ms. Dhaifallah Made Inculpatory and False Statements to the FBI**

13  After Mr. Al Eyani and Ms. Dhaifallah were arrested on August 25, 2020, the FBI attempted to

14  speak with them.  Mr. Al Eyani requested a lawyer and refused to talk.  Ms. Dhaifallah spoke with the

15  FBI for over two hours.

16  Over the course of her post-*Miranda* interview, which was conducted in English and was

17  recorded, Ms. Dhaifallah leaned in heavily to her religion and suggested that she could not speak with

18  men other than her husband.  She made various attempts to exculpate herself, including various times

19  saying that what she did was lawful.  She limited her involvement to helping her husband because her

20  husband's English was not as strong as hers.  She said she just did what Mr. Al Eyani told her to do.

21  However, in so doing, Ms. Dhaifallah ended up admitting that Mr. Al Eyani had a business

22  selling things, including cars, to Yemen.  She also admitted that she made purchases of "telescopes" to

23  send to Yemen.  She also admitted to seeing the ATN email regarding the export control of those

24  devices and admitted to telling Mr. Al Eyani about the email.  She admitted that she knows how exports

25  work, and that you need a license to send things overseas.

26  Ms. Dhaifallah also made false statements to the FBI.  She spoke to the FBI special agents about

27  several topics, including what she knew about the purchase of rifle scopes and similar items by herself

28  and Mr. Al Eyani.  In particular, when Ms. Dhaifallah was asked by an FBI special agent, with regard to

UNITED STATES' SENTENCING MEMORANDUM
Case No. 22-CR-00278 CRB

11

certain ATN rifle scopes, "You had no knowledge that these were going overseas?," she falsely

responded, "That's 100%." The FBI special agent then asked, "You did not have any intention to send

these to any country?" Ms. Dhaifallah falsely responded, "No way." In truth, as Ms. Dhaifallah knew at

the time she made her statements, Ms. Dhaifallah was aware that the items were going to be sent

overseas, and Ms. Dhaifallah did acquire rifle scopes and similar items with her husband with the intent

to send them from the United States to another country. Ms. Dhaifallah knew at the time that giving a

false statement to the FBI special agent was unlawful and that sending ATN rifle scopes out of the

country without a license was unlawful.


## ARGUMENT

As explained below, the United States requests that the Court sentence Mr. Al Eyani to: (1) 48

months incarceration; (2) three years of supervised release, with special conditions as set out by the

United States Probation Office in the PSR; and (3) a special assessment of $800.00. The United States

joins the Probation Office and Ms. Dhaifallah in requesting that the Court accept Ms. Dhaifallah's plea

and impose the following sentence: (1) three years of probation, with special conditions as set out by the

United States Probation Office in the PSR; and (2) a special assessment of $100.00. The United States

further requests that the Court order forfeiture of the property outlined in each of the plea agreements in

this matter.

## I.   The Sentencing Guidelines Calculations and Proposed Sentences

### A.   Mr. Al Eyani's Calculation

The United States agrees with the criminal history calculations in Mr. Al Eyani's PSR, which

result in a Criminal History Category of I. PSR ¶¶ 40-44.

The United States and Mr. Al Eyani agreed to a Total Offense Level calculation of 23 in the Plea

Agreement (taking into account Mr. Al Eyani's acceptance of responsibility). Dkt. 78 ¶ 7. The

Probation Office calculated the same Total Offense Level in the PSR. PSR ¶¶ 26-39.

The Guidelines imprisonment range for a Total Offense Level of 23 and a Criminal History

Category of I is 46 to 57 months. U.S.S.G. Sentencing Table.

The Probation Office recommends a downward variance and a sentence of 36 months to be

1  followed by three years of supervised release.

2       The United States recommends a sentence of 48 months, with three years of supervised release to

3  follow.

4       **B.     Ms. Dhaifallah's Calculation**

5       The United States agrees with the criminal history calculations in Ms. Dhaifallah's PSR, which

6  result in a Criminal History Category of I. PSR ¶¶ 39-46.

7       The United States and Ms. Dhaifallah agreed to a Total Offense Level calculation of 4 in the Plea

8  Agreement (taking into account Ms. Dhaifallah's acceptance of responsibility).  Dkt. 79 ¶ 7.  The

9  Probation Office calculated the same Total Offense Level in the PSR.  PSR ¶¶ 29-38.

10      The Guidelines imprisonment range for a Total Offense Level of 4 and a Criminal History

11  Category of I is 0 to 6 months.  U.S.S.G. Sentencing Table.

12      The United States, Ms. Dhaifallah, and the Probation Office all recommend the Court accept Ms.

13  Dhaifallah's plea made pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure and

14  impose a sentence of three years of probation.

15  **II.    The Proposed Sentences are Just and Meet**

16      The Court should impose a sentence sufficient but not greater than necessary to reflect the

17  seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate

18  deterrence; to protect the public; and to provide the defendant with needed educational or vocational training,

19  medical care, or other correctional treatment. *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); *see*

20  *also* 18 U.S.C. § 3553(a). The Court should begin the process of determining an appropriate sentence by

21  calculating the correct sentencing range under the advisory Guidelines. *Id*.

22      After determining the appropriate advisory Guidelines calculation, the Court should then evaluate the

23  sentence for substantive reasonableness considering the factors set out in Section 3553(a). *Carty*, 520 F.3d at

24  991-93. Under Section 3553(a), in arriving at the appropriate sentence for the defendant, the Court should

25  consider these factors applicable to this case, among others:

26      (1)    The nature and circumstances of the offense and the history and characteristics of the

27             defendant; 18 U.S.C. § 3553(a)(1);

28      (2)    The need for the sentence imposed to reflect the seriousness of the offense, to promote

respect for the law, and to provide just punishment for the offense; 18 U.S.C. §
3553(a)(2)(A);

(3)     The need for the sentence imposed to afford adequate deterrence to criminal conduct; 18
U.S.C. § 3553(a)(2)(B); and,

(4)     The need for the sentence imposed to protect the public from further crimes of the defendant.
18 U.S.C. § 3553(a)(2)(C).

The United States avers that its two proposed sentences are just because they take into account
the various considerations set out in Section 3553(a) of Title 18 of the United States Code.

**A.      Mr. Al Eyani was the Primary Actor in this Criminal Endeavor and Therefore Deserves a Significant Sentence**

In light of the Section 3553(a) factors, Mr. Al Eyani should be sentenced to 48 months of
incarceration followed by three years of supervised release.

**1.      The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**

As the facts make clear, Mr. Al Eyani was running a business of sending weapons and night
vision capable devices to the Sultanate of Oman.  He was the primary actor in his scheme and is
responsible for every part of it.  The Middle East has been war-torn for years; Mr. Al Eyani's home
country of Yemen has been in a civil war since 2015.  The United States has set its export laws,
including the AECA and the ITAR, with an eye toward preventing the use of American goods in foreign
wars.  Yet Mr. Al Eyani deliberately evaded those laws and sent weapons of war to the area.  It is a
serious offense deserving significant and serious punishment.

As for Mr. Al Eyani's characteristics, it appears from his PSR that he has had a relatively decent
life, unmarred by substance abuse, mental illness, or childhood trauma.  PSR ¶¶ 51, 57, 58.  While it is
true that Mr. Al Eyani has no criminal convictions in the United States, it is not clear that his criminal
history encompasses his entire conduct since he lived outside the United States until he was 22 years
old.  PSR ¶ 52.  Since the Guidelines sentencing range for Mr. Al Eyani is 46 to 57 months, and by
definition takes into account Mr. Al Eyani's lack of criminal convictions, selecting a 48-month term of
incarceration, on the lower end of the sentencing range, gives Mr. Al Eyani further credit for his

1   criminal history.

2   **2.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense,**
3   **to Promote Respect for the Law, and to Provide Just Punishment for the**
     **Offense**

4        As noted, violating the AECA and the ITAR by sending weapons of war to the Middle East is a

5   serious crime.  Mr. Al Eyani knew he was violating the law – after all, he signed a form telling him

6   about the export laws and then hid firearms disassembled and wrapped in tin foil inside a shipping

7   container in an effort to avoid detection – and did it anyway.  A just punishment is within the Guidelines

8   range, and the United States contends that 48 months is appropriate as it is on the lower end of the

9   Guidelines range.

10  **3.    The Need for the Sentence Imposed to Afford Adequate Deterrence to**
     **Criminal Conduct**
11

12       Policing the ports of this country is both a Herculean and Sisyphean task.  There are simply not

13  enough law enforcement officers or resources to search every shipping container leaving the many ports

14  of our country.  There are not enough law enforcement officers or resources to search every shipping

15  container leaving the Port of Oakland here in the Northern District of California.  Accordingly, many

16  criminal export schemes like Mr. Al Eyani's go undetected.

17       As a result, a significant punishment is necessary to deter other individuals who might consider

18  engaging in similar criminal export endeavors.  A sentence of 48 months would serve as general

19  deterrence.

20  **4.    The Need for the Sentence Imposed to Protect the Public from Further**
     **Crimes of the Defendant**
21

22       Imprisoning Mr. Al Eyani for 48 months will prevent him from committing further crimes,

23  protecting the public during that time period.  Afterwards, a period of three years of supervised release

24  will provide supervision by a probation officer.  The addition of a suspicionless search condition will

25  enable the probation officer to investigate Mr. Al Eyani's conduct before it is too late, that is, to search

26  any shipments Mr. Al Eyani might make and to inspect his home and books to see if Mr. Al Eyani has

27  restarted his arms-running business.

28       In the end, it is the position of the United States that the proposed sentence of 48 months

UNITED STATES' SENTENCING MEMORANDUM
Case No. 22-CR-00278 CRB

15

incarceration is sufficient, but not greater than necessary, to comply with the purposes of sentencing. *See* 18 U.S.C. § 3553(a).

**B.     Because Ms. Dhaifallah's Involvement in this Criminal Enterprise was Limited and Her Conviction Concerns Her Lying to the FBI, Probation is an Appropriate Sentence**

In contrast to Mr. Al Eyani, Ms. Dhaifallah was only a cursory participant in Mr. Al Eyani's business of sending weapons and night vision capable devices to the Sultanate of Oman.  As a result, her sentence should reflect that, and the Court should accept her guilty plea and sentence her to three years of probation for lying to the FBI.

**1.     The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**

Ms. Dhaifallah pleaded guilty to lying to the FBI about her knowledge of her husband's criminal scheme.  Enabling the FBI to investigate crimes is an important goal for our country, and thus, criminalizing lying to the FBI plays an important role in helping the FBI in its mission.

Ms. Dhaifallah has had a complicated trajectory, including the death of close family members, arranged marriages, domestic violence, and mental health issues.  PSR ¶¶ 48-54; 57.  Despite this history, Ms. Dhaifallah obtained a two associate degrees and a Bachelor of Science degree in the Bay Area.

Three years of probation is an appropriate sentence.

**2.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense**

A felony conviction for lying to the FBI will have employment and voting repercussions for Ms. Dhaifallah, and the three years of probation will also be a punishment reminding Ms. Dhaifallah of her crime.  The Guidelines range for her offense is 0 to 6 months, and a sentence of three years of probation is consonant with that range.

**3.     The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct**

Prosecuting lying to the FBI sends a message to others who might try to lie to the FBI in other situations that such conduct will not be tolerated.  Surely, incarceration send a strong message, but

1   probation sends a message as well, and in this instance is the appropriate level of deterrence for the

2   crime.

3           **4.**       **The Need for the Sentence Imposed to Protect the Public From Further**

                      **Crimes of the Defendant**

4

5         Ms. Dhaifallah is unlikely to commit another crime like this one, and a period of three years of

6   probation while under the supervision of a probation officer will ensure it.  Ms. Dhaifallah's husband,

7   Mr. Al Eyani will be incarcerated under the United States' proposal, removing from Ms. Dhaifallah's

8   orbit the primary driver of the criminal export scheme in this case.  She will also be unlikely to interact

9   with other government officials and the FBI going forward.  Accordingly, the probationary sentence

10   proposed is sufficient to deter Ms. Dhaifallah from committing futures crimes.

11         In the end, it is the position of the United States that the proposed sentence of three years of

12   probation is sufficient, but not greater than necessary, to comply with the purposes of sentencing.  *See*

13   18 U.S.C. § 3553(a).

14

15                                   **CONCLUSION**

16         For the reasons set forth above, the United States requests that the Court impose the following

17   sentence on Mr. Al Eyani: (1) 48 months incarceration; (2) three years of supervised release, with

18   special conditions as set out by the United States Probation Office in the Presentence Investigation

19   Report ("PSR"); and (3) a special assessment of $800.00.  Further, the United States joins the Probation

20   Office and Ms. Dhaifallah in requesting that the Court accept the Ms. Dhaifallah's plea and impose the

21   following sentence: (1) three years of probation, with special conditions as set out by the United States

22   Probation Office in the PSR; and (2) a special assessment of $100.00.  Finally, the United States

23   requests that the Court order forfeiture of the property outlined in each of the plea agreements.

24   DATED: March 22, 2024                 Respectfully submitted,

25                                  ISMAIL J. RAMSEY

26                                  United States Attorney

27                                  */s/ Nicholas Walsh*

28                                  NICHOLAS J. WALSH

                                        Assistant United States Attorney